Good morning. May it please the Court, I'm Michael McCabe. I represent the claimants' appellants in this case, Arthur Harris and Richard Barnett. Mr. Barnett is co-counsel and is present with me at counsel table. I'd like to direct my argument to the two searches at issue and raised in the briefing, that is the legality of those two searches of appellant Arthur Harris's residence, the first of which occurred on May 6, 2004, and the second on July 28, 2005. And the arguments are very different, as you are aware, as to each of them. With respect to Could I just ask a threshold question? Why does Mr. Barnett have Fourth Amendment standing to raise these suppression issues, since he didn't have a privacy interest in the House? We do have a difficult problem there, and I also recognize that even though that wasn't raised by the prosecution below, that it nevertheless is a proper inquiry for this court under the appellate rule that any rational basis for affirming the judgment of the district court, whether or not relied upon by the government, is sufficient. And so we will submit that issue, essentially the equivalent of withdrawing it. We do agree, quite frankly, at this stage that that the point is well taken, since he did not have a possessory interest in the property at the time that the second search occurred. It was simply a security interest that he, I'm hard pressed to come up with a theory under which he has standing to contest that search. And of course, we weren't making that claim as to the first search, which occurred before he acquired that security interest. So we're devoting our efforts to the legality of the two searches at issue, the first of which on May 6, 2004, involves the question, of course, as to whether or not the Second Circuit case of Marine Buitrago controls. We assert that it does. In that particular case, of course, the Second Circuit, borrowing from Franks v. Delaware, determined that where information comes to light after a search warrant has been issued, that is when a definite and material change has been made to the probable cause, it's the magistrate and not the executing officers who must determine whether probable cause still exists. Therefore, the magistrate must be made aware of any material new or correcting information. What was the definite material change in fact here? The location of the firearm. And the assertion by Mr. Harris that the firearm had been turned over to his client, that the Marine Buitrago court was concerned with. But why would the police have a duty to verify a self-serving statement by someone whose house was about to be searched? Well, because, as the Second Circuit indicated, that is a material change in the facts. Marine Buitrago itself... No, I'm just saying that they don't necessarily have to believe his statement that the gun is not located there. Well, in this particular case, there was no reason for them not to have determined the legitimacy and veracity of that statement. They had everything they needed to do so before them. There was a specific and identifiable object, the firearm, which was the only object as to which there was probable cause in the search warrant and the only real evidentiary item which was being sought. There was a likelihood, under the circumstances and Mr. Harris's status as an ex-felon, that he would be motivated to get rid of the gun rather than hang on to it. Why wouldn't he be equally... Isn't it fair inference that he would be equally likely as an ex-felon to hold on to the gun? Well, primarily because he knew at that particular point in time that Ms. Wynne had gone to the police. He'd been informed two days earlier that she had gotten a restraining order against him prior to the execution of the search. And if he wasn't motivated in the first instance, immediately following the encounter that is the confrontation between the two of them to get rid of the gun and to dispossess himself of it, if he ever had actual possession of it, that interest was heightened when he certainly learned two days before the execution of the search warrant and was served with the restraining order. So he had to... Excuse me? Counsel, when you're done, I have a question for you to follow up on. All right. Thank you, Your Honor. And if I may, in this particular case, the entire premises had been secured. Mr. Harris told them exactly who it was who had the gun and how it came into his possession. The officers themselves knew this individual who was a former colleague of theirs on the SDPD who was an investigator. They had his telephone number, his name address, and telephone number. All they had to do was pick up the phone and call him and inquire. And if they wanted to confirm whether or not the weapon in question was the same one that they were searching for, the private investigator's office was only two minutes from the Harbor Patrol police headquarters. And they could have... He could have brought the firearm to that location and the people there could have... His colleagues, that is the searching officer's colleagues, could have inquired as to the serial number. He would have given them the serial number and that would have established it. All of that could have been accomplished in five minutes. There was no reason in this particular case for them not to take that step. And those are the reasons why I believe in this particular case that it was incumbent upon the officers to make that inquiry in order to discharge their responsibilities of determining in accordance with the Second Circuit's rationale that probable cause still existed for the firearm in question when there was a serious question raised as to that issue. Yes, Judge Gold? Yes. My question is this. It's really following up on Judge Wardlaw's initial question. Why is there a duty of the police to accept a self-serving statement by the subject of the search? So, for example, it is probably true here that they could have checked up on the investigator having the gun pretty simply. But let's take a different hypothetical. If police were searching just for some kind of illicit drugs and the renter of an apartment said, I don't have any drugs here. You can ask my two or three best friends and roommates who are always here and they could tell you there are no drugs in this place. Would the police have to report that back to a magistrate? I don't think so. And if not, then what's different about a guy who's the subject of a search for a gun who says, I don't have the gun here. I gave it away. Well, the factors which I mentioned are, in fact, the factors which are determinative. First of all, in the case which the court just proposed, we're talking about an item that is drugs. Here, we're talking about a specific identifiable object with a serial number, which can definitely be determined beyond any doubt as to whether or not the object in question is where the defendant says or the object of the search, the person being searched, says it is. Secondly, drug dealers are always likely to have a steady supply of drugs on hand at various distributing locations. Here, by contrast, this individual had every reason not to possess the gun in question by virtue of his status as a felon and as having been alerted two days previously that Ms. Wind had gone to the police when he served with the restraining order. Third, the drugs are not here, doesn't, in the court's hypothetical, doesn't answer the question as to where they are or to defeat probable cause in that respect. Here, by contrast, we have the name, address, and telephone number of the person in possession of the gun and where that person can be contacted. Fourth, the generic location of drugs is, you know, I sold it to Fred or I don't have the gun, as my good friends say so. Here, the person who has, who relates to the police, has the firearm, is an individual who all of the searching agents knew who was a former colleague of theirs. And the record is that, that all of the searching agents knew that the person who your client said he had given the gun to was a former colleague of theirs. Well, that was in the, in the deposition testimony of Agent Lauks, which is in the record and which was relied upon by the district court. And if I may, finally, it is easy to confirm the information by a simple telephone call, as I indicated in response to Judge Ikuda's question initially, and to confirm that by having the private investigator take the weapon to the Harbor Patrol Station, where the colleagues of the searching agents could confirm that it was the weapon in question. May I just ask you this? Let's say that we agreed that the district court had made an error in its motion to suppress. Isn't the evidence, in any event, admissible against Mr. Barnett with respect to the forfeiture proceeding? Since he isn't, he doesn't have standing to raise the Fourth Amendment objection? Yes, but that doesn't defeat the claim of Mr. Harris at this point. Let me ask you about Mr. Harris for a moment, because Mr. Harris stipulated that the property was subject to forfeiture with respect to its use for narcotics transactions, and then he retained only the ability to raise other claims, like he raised the claim that the forfeiture violated the Eighth Amendment, which the district court denied and is not on appeal here. So if Mr. Harris has already stipulated that the house is forfeitable with respect to the fact that it was facilitating narcotics transactions, why does it make a difference what the evidence shows here? He's already stipulated to that. Well, because there was a specific reservation in that stipulation that he would be entitled, much as in the case of a conditional plea of guilty, to litigate the validity of the searches in question, which led to the discovery of the drugs, which, in turn, established the basis for forfeitability. Now, he doesn't quite say that, does he? He... Did the government make that argument in opposition? No, that argument was not raised by the government in opposition or below. Oh, in their red brief, they raised this question about Fourth Amendment standing. In this stipulation, it says that the parties stipulate that the claimant reserves the right to contest all issues other than the forfeitability of the facilities facilitating narcotics transactions. And what did that mean? I'm sorry. Well, you know, we can't have this. We can't have counsel trying to do oral argument and respond to Judge Ikuda's questions and you whispering in his ear at the same time. It's quite disruptive. Do you recall what Judge Ikuda's question was? I believe that Judge Ikuda's question was whether that language encompassed what we are... What does... What do you understand that to mean? That the parties stipulate that the claimant reserves the right to contest all issues other than the forfeitability of the defendant race based on its facilitating narcotics transactions. Well, I think that what that means is that we are agreeing under the provisions of the law, Section 881, but that we are reserving all other objections to the execution of that judgment, including but not limited to litigating the only real issues in this case, which were the legality of the two searches at issue, which led to the discovery of the drugs, which in turn established the forfeitability of the race, the RES race, his home. And the object in doing that was to avoid having the governments have to go forward with a motion for summary judgment at that stage of the proceedings. It was an accommodation to government counsel to enable us to maintain and to address the real issues in the case, the legality of the searches at issue without requiring the government to go through the pro forma act in this particular case of asserting the forfeitability of the race once the motions to suppress have been denied by the district court. And now I'll ask my question again, and I'd like counsel to answer it. Has the government ever asserted a contrary understanding of your stipulation? No, there is no such thing. The only objection to standing in the government's brief is with respect to that of Mr. Barnett, not with respect to the issue of standing as to Mr. Harris. And there is no argument raised that the stipulation waived the right to raise these issues on appeal. As to the other aspect of the first search which we are challenging, that's the staleness issue. That was an argument which the district court initially agreed with and granted the motion to suppress, grounded upon a finding of staleness in this particular case, and then reversed herself in response to the government's request for reconsideration. And I think that it's important here, the factors with respect to the motivation of this particular individual to get rid of the gun rather than to maintain it for an excessive period of time, the argument dealt with, I'd ask the court to simply look at the chronology of events here. One other fact in that chronology, didn't Officer Asbell speak with Wynn the day before and she told him that the gun had not yet been returned to her? Well, yes, that may have been true. But I don't think that that necessarily or established that the warrant was not stale or that there was reason to the firearm would still be on the premises to be searched. The relevant inquiry is, is it reasonable to assume that given the passage of time, the nature of the object and the nature of the individual to be searched, that the weapon is still going to be on the premises, not that it is returned to the rightful owner or in some other particular place. And I think that the chronology of events here really brings that out. It was April the 22nd when the encounter occurs. On April the 27th, he, that is Mr. Harris's, served with the restraining order. On April the 29th, the search warrant is issued. And on May the 6th, the warrant is executed. And I misspoke initially. I said that it was two days prior to the execution of the warrant. It was actually two days prior to the issuance of the warrant that Mr. Harris learned that Ms. Wynn had gone to the police and he was served with the restraining order. So under all of those circumstances and going into the evaluated and determining staleness, which are the continuity of the criminal activity, there is no continuity of criminal activity in this case. Two, the elapsed time between the last event establishing probable cause and the execution of the warrant, that was 14 days between the report and the execution of the warrant. Three, the use of words of present or past tense in the affidavit. It was all past tense, nothing about any activity of Mr. Harris with respect to that firearm. And finally, and in this case, I think most importantly, the likelihood of movement of the property sought in the warrant. And there was a very strong likelihood of removal for the reasons which I previously expressed in response to the court's questioning under Buitrago. Is the legal standard on the staleness issue in substance a subset of the standard in Gates? That is, when we look at staleness, are we asking, is there still a fair probability that the object of the search will be there? I would say that that's, they're pretty close, yes. And for the reasons which I have asserted, there was an overwhelming likelihood under these circumstances that the object of the search would not be present on the premises, which also, bootstrapping somewhat, confirmed and added credibility to Mr. Harris's statement regarding the firearm not being on the premises at the time that the agents went to execute that search warrant. As to the second search, the issue here is also... You are over your time, so I'm going to have to ask you to sum up. All right. Summing up, Scott does not authorize this particular search. Probable cause was not briefed or raised by the government below. The district court improperly determined that there was probable cause without granting to us an evidentiary hearing, and there was no opportunity prior to the ruling of the district court to request such an evidentiary hearing because the issue was never raised. The government relied upon the validity of the so-called fourth waiver and the consent of Mr. Harris to its imposition, neither of which are relevant after Scott, and never asserted that there was probable cause to independently support that search, which was the critical factor, the alternative factor relied upon by the district court in upholding it. All right. Thank you very much. Good morning, Your Honors. Leah Bussell, Assistant United States Attorney, appearing on behalf of the United States. Your Honors, this case has been very fact-intensive and focuses primarily on the two searches. On April 22nd, 2004, Cheryl Wind called the San Diego Police Department to report that she had been beaten and that Arthur Harris, a convicted felon, a thrice convicted felon, had stolen the gun from her purse, and it was a loaded firearm. And there were at that same time pending three investigations for Mr. Harris having violated restraining orders and contempt violations. And there was also a spousal abuse claim then pending and a criminal contempt action then pending. The investigating officers took their time, investigated Ms. Harris, let her come into the office and spoke with her. They sent her to the separate domestic violence unit for what the domestic violence support provides her, which would include a civil restraining order against him, which was referenced by Mr. McCabe having been served later. That is not a function of the San Diego Police Department, nor its criminal enforcement action. Mr. Harris's criminal history included intimidation of a victim. He had two prior drug convictions and he had a history of violence towards women. With all of that in mind, they presented to Judge Frank Burns an affidavit for a search warrant for the residence and Judge Brown found that there was probable cause to believe that the gun, which is a hard durable item and any ammunition and any other paraphernalia related with firearms would be located in the residence. That warrant was issued on April 29th and on May 6th that was executed. There's a dispute as to when Mr. Harris told the law enforcement officers that went to execute it that he had turned it over to his lawyer or to an investigator. What did the district court find? The district court found that it was irrelevant as to the timing because the district court found that a self-serving statement of denial of the possession of contraband is never going to change the original finding of probable cause. And that's the government's issue or our position for purposes of appeal is that that would never negate the probable cause. No law enforcement officer should ever have to take any defendant's statements as true. But isn't there more in this case? And counsel ably pointed out all these additional facts that maybe in this particular case point to, you know, the reasonableness of having these police officers just make a simple phone call. In this particular case, I would argue that the facts go the exact opposite way, Your Honor. The reason it took time to put this search warrant and search together was because this was a violent convicted felon and they had to assemble the SWAT team with the thought that they were going to have to have a They have a SWAT team at the execution of the search? Is that in the record? There is testimony in both the depositions and in one of the declarations that that was the reasoning why they why there took time between the time they got the warrant and the original information and went to execute it. And in fact, when they went to execute the warrant, their belief was Mr. Harris tried to flee. They had planned to do an arrest away from the premises. And as soon as he saw the marked squad cars, he drove back into his garage and attempted to close the door and that accelerated the entire execution of the warrant in a fairly violent manner. There's testimony that Mr. Harris was resisting being arrested because he was going to be arrested in any event on the domestic violence charges and that a long list of profanity came out of his mouth and it was difficult to calm him before they could bring him into the premises and seat him at the on the couch in the living room and then read him the warrant. And of course they did a protective sweep right away and then started executing the search pursuant to the terms of the search warrant. So with Mr. Harris's criminal history, there was actually more reason to believe the gun would still be there. He had a history of drug possession and sales. He had a history of intimidation of witnesses and he had a history of violence toward other individuals. So they had every reason to believe the gun would still be there. And they actually took the extra step of calling the day before they went to execute the warrant to determine whether Ms. Wind had recovered the gun and they had no record that any gun had been turned into the San Diego police department, which if Mr. Harris was so concerned about his status as a felon, he could have easily had his attorney or investigator turn it over to the police department as soon as he theoretically gave it to the investigator. In any event, we believe that the search was proper. There was no changed circumstances mandating the officers go back to the issuing judge with any additional information. In any event, that search would have been saved even if this court were to find that they should have under the liaison good faith, because in good faith, they were executing the validly issued search warrant. They do not, the appellants do not dispute the probable cause existed for the issuance of the search warrant. Their whole argument relates to staleness and timing. And this, the Ninth Circuit has found in a gun case, U.S. versus Collins, that six weeks did not render the information stale from the time that they learned of a gun until they went to execute a search warrant. And likewise, this court in U.S. versus Greeney in a marijuana case said that two years between the information of a marijuana grow on property and the subsequent issue, issuance and execution of a search warrant did not render the information stale, such as to justify suppression of the search. Turning now to the July 28th, 2005 search, there's a number of things that come up with respect to the 2005 search. Not the least of which is the facts were uncontested on the motion, on the government's response to their motion to suppress. And the district court made that finding, or a series of findings that the government's assertions of the facts giving rise to probable cause for the search were uncontested. That's in the court's order. But the essence of the court's findings were that the officers were watching Mr. Harris. They watched him leave his house in a vehicle, drive away, go into a nearby parking lot, pull up next to another vehicle, get out of his vehicle, and slide into the passenger seat of the vehicle right next to him, do something which appeared in their training and experience to be a hand-to-hand drug transaction, get back in his vehicle, and drive away. The affidavit, I guess by Detective Greeney, is somewhat vague on that, on what exactly he saw. It just has a conclusory statement that what appeared to be a narcotics transaction. How are we to take that when it's not specified exactly what they saw? Well, since it was uncontested by the appellants, I believe that you'd have to find that the district court made clear error in making its factual finding that that is what the agent observed was a hand-to-hand transaction. Because the district court's order makes a finding that that specific allegation was uncontested by the appellants. And so, they then search Mr. Harris, they search the car, they find two marijuana cigarettes, they are aware that Mr. Harris is on fourth waiver from his state court case, they go back to the house and they search it. And again, 15 months after the first search, find drugs in even greater quantities than the first search. The California Supreme Court in York discussed the California statute under which the search condition had been imposed, California Penal Code Section 1318. And it is very different than the Scott analysis that dealt with the Nevada statute. In York, the California Supreme Court turned to the legislative history of section 1318 and found that not only did it have a purpose to ensure defendants make their court appearances, but also had a public safety purpose. And so, when you're bringing the York analysis into the Scott, the Ninth Circuit's opinion in Scott, you have to remember that one of the things that Scott turned on is what is the statutory purpose? And the statutory purpose for California statute 1318 is different than Nevada's because it's broader. It is not solely to ensure appearance at all court proceedings. It is also to ensure public safety. The other thing that distinguishes this case from Scott is that the search condition was imposed after Mr. Harris had already had a bail hearing in two separate cases. And the district attorney was seeking to revoke his bond and put him back into custody because of ongoing domestic violence claims by Ms. McCarty against Mr. Harris. And the district attorney's office was seeking to have him put back in custody. And there was a contested hearing in state court. This court has the entire transcript in the record. It was evidentiary. The court declined to impose revocation at that point. However, it did modify the terms of the bond and his release by requiring a fourth amendment search condition in addition to no firearms condition, but also colloquied Mr. Harris on the record. And that is also before the court and the state court asked Mr. Harris, do you understand what I'm saying? Mr. Harris, if you want to remain on release, you must comply with these has a requirement. Defendants must sign if they have to agree to all reasonable conditions imposed by the court in OR and bond releases. Mr. Harris had in fact signed such a such condition on his prior releases and Mr. Harris states on the record. Uh-huh. And the district court, the state court again asked him, Mr. Harris, do you understand? And he says, yes, your honor. I understand. So what you have is a very different situation. I understood your argument to be that, um, not distinguishing Scott, but that the probable cause or the reasonableness of the search satisfied Scott. It does. And, and that is obviously this court can sustain the district court's order on any grounds because it's de novo. It's a fourth amendment issue, but yes, the government's position is there was also probable cause for the search. Which satisfies Scott's big concern that there would be suspicionless searches based on waivers. Because Scott's analysis as the district court found was based, a defendant's consent is based upon the reasonableness of the search. They actually do a balancing of that consent against that. So in this particular case, there was articulated probable cause for the search. And so under Scott, it would have been, it should be sustained. In any event, your honor, the court is well aware that if the court sustains the first search, the court doesn't even need to get to the second. Don't the second two arguments both depend on hinge on whether or not we sustained the, the, the, well, we affirmed the district court's denial of the motion to suppress of the first search. Yes. Yes. And if your honors have no further questions, I would submit on the briefs. All right. Thank you very much. Thank you. Thank you. Okay. You can have one minute. It's not fair to the other parties when some people get extra time and some people don't. So go ahead. I appreciate the opportunity. First of all, there was no SWAT team on the scene. There was no evidence of any SWAT team on the scene. And this is as to the first search, of course. And the reason, the primary reason why it took so long to execute that warrant wasn't because of any carefulness on their part. Agent Louk's deposition makes clear that the main problem was he was on vacation and that's what caused the difficulty. There was no resistance. And I don't see how that's relevant in any event. And the two cases cited with respect to staleness Collins and Greeney are ongoing criminal activity. There was no such thing in this case. Thank you. All right. Thank you. Thank you both counsel for your well done arguments today. They're very helpful. Thank you. All right. We will take up Kugalon versus Rice.
judges: Wardlaw, Gould, Ikuta